IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**KRISTIE JONES**,

          *Plaintiff*,

v.

**JANUS HOTEL MANAGEMENT SERVICES, LLC,**

          *Defendant*.

CAUSE NO. 3:22-CV-19-CWR-LGI

## ORDER

Before the Court are the Defendant's *Motion for Summary Judgment*, the Plaintiff's response in opposition, and the Defendant's reply. Docket Nos. 44, 50, and 52. Upon review, the motion will be granted in part and denied in part.

**I.  Facts and Procedural History**

On January 23, 2020, Plaintiff Kristie Jones applied to work as a night auditor at Candlewood Suites, a hotel operated by Janus Hotel Management Services. Docket No. 44-2. Shortly thereafter, Jones was called in to interview by hotel manager Amarjit "A.J." Singh.

During her interview, Jones explained to Singh that she was recovering from a "nervous breakdown" and suffered from "depression, anxiety, and insomnia." Docket No. 50-1. Working the nightshift, Jones said, would allow her to better manage the

treatment of her disabilities. *Id*. She was officially hired to the night auditor position on February 12, 2020.

As part of her onboarding, Jones was required to review the Janus Employee Handbook and sign the corresponding acknowledgment form. The handbook articulated that "[f]lexibility in scheduling your work hours is required in the hospitality industry. Therefore, an employee's scheduled work hours and days may vary depending on [Janus]'s needs and the employee's job classification." Docket No. 44-4. Jones signed the acknowledgment form. Docket No. 44-3 at 6.

When Jones began working at Candlewood Suites, she did not operate on a set schedule. Docket No. 50-1 at 11. Noticing scheduling issues at the hotel, Jones proposed to Singh that she work a set weekend shift schedule with fixed hours. *Id*. at 12. That proposed schedule would permit Jones to work as a night auditor three days of the week: Fridays from 7:00 pm to 7:00 am, Saturdays from 7:00 pm to 7:00 am, and Mondays from 3:00 pm to 11:00 pm. *Id*. Singh agreed. *Id*. During that same conversation, Singh further inquired as to whether Jones would be available in the event of some emergency. *Id*. Jones replied, "just text me, we'll see on a case-by-case basis." *Id*. Jones worked her proposed schedule "with some consistency." *Id*.

In early March 2021, Jones began to experience severe pain in her abdomen. She was diagnosed with gallstone pancreatitis. On March 26, 2021, Jones called Singh to request medical leave while en route to emergency surgery. Docket No. 44-6. Three days later, Jones provided Singh with a doctor's note excusing her absences from work due to surgical recovery. Docket No. 44-9. The note stated that Jones would be cleared to return

2

to work on April 12, 2021. *Id*. The doctor's note did not place any limitations on Jones' work schedule, explain the need for any accommodations, or specify any limitations as to her ability to perform her job duties. *Id*.

On April 7, 2021 — five days before Jones was slated to return to work from medical leave — Singh hired 21-year-old Ariel Taylor to work as a night auditor at the hotel on Fridays and Saturdays from 7:00 pm to 7:00 am. Docket No. 50-6. Singh hired Taylor to work both of those shifts "[b]ecause she was looking for [a] part time job only and those were the only days she could work." *Id*. But when probed by Jones as to why "her" Friday, Saturday, and Monday schedule was no longer available, Singh stated, "Look, look, I've hired someone. She's a lot younger and is less likely to get sick, and she can only work those shifts." Docket No. 50-1 at 14.

Starting on April 12 (the date Jones was eligible to return from medical leave), Singh and Front Desk Manager Sam Simpson began to offer Jones working shifts. Docket No. 44-11. Most of these offered shifts were scheduled for dates and times that did not align with Jones' previous Friday, Saturday, and Monday schedule. *Id*. While Jones accepted and worked some of these offered shifts, she gradually began to decline Singh's and Simpson's offerings, and soon started requesting that she be permitted to work "her shifts." *Id*.

Still inclined to provide Jones with opportunities for work, Janus continued to offer Jones shifts at the hotel. But management stopped offering Jones working shifts once she texted Simpson: "[y]ou can contact me when my regular shift/schedule is available." *Id*.

When the Friday, Saturday, and Monday schedule became available once again months later, Janus did not contact Jones to return. Jones was never terminated from her employment at Candlewood Suites.

Jones commenced this suit bringing claims against Janus under the Family and Medical Leave Act, the Rehabilitation Act, the Americans with Disabilities Act, and the Age Discrimination in Employment Act.[1] She asserts discrimination, retaliation, and failure to accommodate claims.

After discovery, Janus filed the present motion. The Court now addresses each remaining claim.

## II.     Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 (1986). A dispute is genuine "if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 (5th Cir. 1999). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).

When ruling on a motion for summary judgment, the district court must "[v]iew the facts and the inferences to be drawn therefrom in the light most favorable to the

---

[1] Jones is no longer pursuing claims under the Family and Medical Leave Act or the Rehabilitation Act.

4

nonmoving party." *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001). To defeat summary judgment, "the party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). It is not the district court's "[d]uty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id*.

### III. Discussion

#### A. Unlawful Discrimination Under the ADEA

Under the ADEA, "a plaintiff can demonstrate age discrimination in two ways, either through: direct evidence or by an indirect or inferential [circumstantial] method of proof." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004). "A plaintiff relying on circumstantial evidence must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Berquist v. Washington Mut. Bank.*, 500 F.3d 344, 349 (5th Cir. 2007) (citation omitted). But "[i]f a plaintiff produces direct evidence of discrimination, no further showing is required, and the burden shifts to the employer." *Id*. At that stage, "it becomes the employer's burden to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citation omitted).

Jones has put forward both direct and circumstantial evidence to establish her ADEA claim. Jones asserts that Singh's comment – "Look, look, I've hired someone. She's a lot younger and is less likely to get sick, and she can only work those shifts" – is direct

5

evidence of age discrimination. Docket No. 50-1 at 14. To determine whether that is the case, we turn to Fifth Circuit case law.

The Fifth Circuit utilizes a four-factor test to determine whether workplace comments comprise direct evidence of age discrimination. Comments may serve as direct evidence of age discrimination when they are "(1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision." *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015) (citation omitted).

Applying the four factors here, the Court finds that Singh's comment constitutes direct evidence of age discrimination. Singh's comment explicitly references Jones' age and health. It was made after Jones returned from medical leave and around the time Singh hired Taylor to work the weekend shift. The comment was also made by Singh, who possessed the authority to create the work schedule. And Singh's words are related to the challenged employment decision, as they explain why Jones was not returned to "her" original Friday, Saturday, and Monday working schedule. Jones has satisfied the four-part test. Singh's comment was not a stray remark. It was direct evidence of age discrimination. Jones has produced sufficient evidence highlighting that discriminatory animus played a role in Singh's employment decision, therefore, the burden of persuasion now shifts to Janus.

Recall that at this stage in the burden-shifting framework for direct evidence, Janus must "[p]rove by a preponderance of the evidence that the same decision would have

6

been made regardless of the discriminatory animus." *Jones*, 427 F.3d at 992 (citation omitted). But here, Janus has failed to proffer any such evidence. At no point in its briefing does Janus argue that it would have hired Taylor to work the weekend nightshift regardless of the alleged discriminatory animus. Therefore, the Court treats Jones' claims as undisputed, and her ADEA claim survives summary judgment.

### B. Unlawful Retaliation Under the ADA

To succeed on a claim of unlawful retaliation under the ADA, a plaintiff must show that:

> (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action. The definition of an adverse employment action in the retaliation context is broader than in the discrimination context. It requires an adverse action that is materially adverse to a reasonable employee, which means that the employer's action is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination. However, the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.

*Stringer v. North Bolivar Consolidated Sch. Dist.*, 727 F. App'x 793, 804 (5th Cir. 2018) (cleaned up).

Jones asserts that she has successfully established a prima facie case for unlawful retaliation. First, Jones contends that "depression, anxiety, and insomnia" qualify as disabilities under the ADA. Docket No. 51 at 10. Next, Jones posits that Janus took several materially adverse actions after she requested medical leave. Jones avers that Janus: "took away Plaintiff's regular shift and replaced her with someone else," "reduced the hours [Jones] was given," and "offered [Jones] shifts at the last minute on an *ad hoc* basis." *Id*. at

7

11. The shifts given to Jones, she submits, were "strictly temporary and fluid" and "when a stable, regular shift came back open, [she] was passed over without notice." *Id*. at 12. Lastly, Jones argues that the close timing between her requested medical leave and Janus's actions provide the requisite "causal connection" for an ADA retaliation claim. *Id*. at 20.

Janus disagrees. Even if Jones can successfully establish a prima facie case for unlawful retaliation, Janus asserts non-discriminatory reasons for its employment decisions: (1) staffing issues during the midst of the coronavirus pandemic and (2) the approval of two other employees' requests for medical leave.[2] Docket No. 52 at 3. At bottom, because Janus was desperate for employees, it "had to make the business decision to hire additional employees to cover the open shifts." *Id*. In light of these nondiscriminatory reasons, Janus posits that it has met its burden of production and that Jones must now submit evidence that Janus's proffered explanation for its hiring decisions is pretextual. *Id*. at 4. Because Jones has offered no such evidence, Janus avers that summary judgment is appropriate. *Id*. at 4-5.

### 1. Protected Activity

First up is whether Jones engaged in a protected activity when she requested medical leave for her gallstone pancreatitis procedure in late March. Federal law states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or

---

[2] It remains unclear why Janus references its approval of other employees' medical leave requests as a potential nondiscriminatory reason for its employment actions as to Jones.

8

> participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12102(a). Under this standard, Jones must show that she had a "reasonable belief that the employer was engaged in unlawful employment practices." *St. John v. Sirius Solutions, LLLP*, 299 F. App'x 308, 309 (5th Cir. 2008) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007)).

Jones has satisfied the protected activity requirement. During Jones' text exchange with Singh, she stated "[n]o, you don't have to report to your employees, but there are laws that have to be followed. You can't give someone's permanent position away to someone else just because they were out sick and you knew they were returning." Docket No. 50-5 at 90. Furthermore, when Jones inquired whether someone else was hired or given "her" shift while she was out sick, Jones emphasized that she would contact her lawyer if she did not resume "her" regular work schedule. *Id.* at 85.

Viewed in the light most favorable to Jones, this evidence demonstrates that Jones believed that her gallstone pancreatitis surgery qualified as a disability and that Jones reasonably believed that Janus's decision to not reinstate "her" Friday, Saturday, and Monday shifts constituted an unlawful employment practice under the ADA. Thus, Jones has satisfied the first element of her prima facie case.

### 2. Materially Adverse Action

Next, the Court analyzes whether Janus's actions were materially adverse. The Fifth Circuit's ruling in *Stewart v. Mississippi Trans. Com'n*, 586 F.3d 321, 331-32 (5th Cir. 2009), is instructive.

In *Stewart*, the plaintiff alleged several adverse actions. *Id*. Those actions included: 1) her placement on administrative leave for three weeks; 2) her reassignment to a new supervisor and heavier workload upon her return; 3) her personal items taken from her desk; 4) her office door's locked changed, which prevented her from closing the door; and 5) being chastised and ostracized by her superiors and co-workers. *Id*. The Fifth Circuit determined that, when considered in context, only the first two actions could have risen to the level of material adversity. *Id*. at 332.

As to the plaintiff's administrative leave allegation, the Fifth Circuit emphasized that the plaintiff "[s]uffered no adverse impact as a result of being place on leave" because she "[c]ontinued to receive her salary and was not requested to use any accumulated leave time." *Id*. "Only three weeks later," the court wrote, "she was reinstated with the same salary." *Id*. Given this context, the Court determined that these events did not constitute a materially adverse action. *Id*. And as to the plaintiff's reassignment allegation, the Court came to a similar conclusion. It asserted that the plaintiff's reassignment "[a]ffected none of her job title, grade, hours, salary, or benefits. Her duties were unchanged . . . ." Taken together, these facts "would not dissuade a reasonable employee from charging discrimination." *Id*.

The facts in this case are not substantially different than those in *Stewart*. Jones was never terminated from her position of night auditor. Never does Jones point to any fact indicating that she was not paid while on medical leave, that she suffered any disciplinary action because of her request, or that she had her salary reduced. Nor does Jones assert that her duties and responsibilities changed after she returned from medical leave.

10

Rather, in an attempt to assert a change in her employment at Janus, Jones clings to the argument that Janus "reduced the hours she was given and offered shifts at the last minute on an ad hoc basis." Docket No. 51 at 13. To Jones, her reduction in hours worked amounts to a materially adverse action. In this context, that is not so.

The record illustrates that Singh and Simpson offered Jones several shifts after she returned from medical leave. Docket No. 50-5 at 86 and 92; Docket No. 50-7 at 2-4, 11, and 22. Although those offerings consisted of shifts other than Fridays, Saturdays, or Mondays, they followed similar start and end times. *Id*. In fact, many of the offered shifts consisted of working hours slated between 3 pm and 11 pm — the same hours as Jones' original Monday schedule. *Id*. Indeed, Jones accepted some of Simpson's and Singh's scheduling offers. But in time, any weekly schedule other than Jones' original Friday, Saturday, and Monday schedule became unacceptable because she believed they were unequivocally hers. That belief led Jones to reject Singh's and Simpson's multiple scheduling opportunities and ultimately request that Janus not contact her unless she could work her previous shift. Docket No. 50-7 at 2.

The Court is not persuaded that Jones' refusal to work available shifts in an industry that demands flexible work schedules is, on this record, a materially adverse action. Because Jones has not advanced facts sufficient to establish that Janus's scheduling decisions amounted to a materially adverse action, or that a reasonable worker would be dissuaded from making or supporting a charge of discrimination, her retaliation claim fails as a matter of law.

11

### C. Failure to Accommodate Under the ADA

Lastly, the Court turns to Jones' failure to accommodate claim under the ADA. Tangled in Jones' claims are two asserted disabilities: gallstone pancreatitis and Jones' mental health symptoms — depression, anxiety, and insomnia.

To establish a prima facie case of discrimination based on the failure to accommodate a disability, the plaintiff must show: "(1) the employer is covered by the statute; (2) she is an individual with a disability; (3) she can perform the essential functions of the job with or without reasonable accommodations; and (4) the employer had notice of the disability and failed to provide accommodation." *Mzyk v. Ne. Indep. Sch. Dist.*, 397 F. App'x 13, 15 n.3 (5th Cir. 2010) (citation omitted).

Janus submits two reasons why Jones cannot sufficiently establish her failure to accommodate claim. First, Janus contends that it was not aware of Jones' disabilities or limitations because Jones never provided Janus with documentation of her alleged disabilities. Docket No. 45 at 18. Second, Janus argues that Jones was offered several accommodations — by way of alternate working shifts — which she ultimately refused. *Id.* at 19. Jones' refusal to work any shift other than her preferred shift, Janus posits, does not amount to a failure to accommodate. *Id.* at 20.

Jones disagrees. She argues that Janus was aware of her medical history. Docket No. 51 at 21-22. She submits that Janus knew of Jones' "history of nervous breakdown and depression," her "medical issues in March, and that she required emergency extensive follow-up visits." *Id.* at 22. Next, Jones asserts that Janus did not make any meaningful effort to provide her a reasonable accommodation. *Id.* at 23-24. She states that

12

Janus "made no inquiry whatsoever into whether these so-called 'alternatives' would actually accommodate [her] medical issues." *Id*. By failing to engage in the next step of the interactive process — and provide Jones with another alternative or "request more medical information to ascertain what would be feasible for her medical condition" — Janus's efforts to accommodate her fell short of the ADA's requirements, she says. *Id*.

### 1. Gallstone Pancreatitis

As to her gallstone pancreatitis, Jones has not established that she can perform the essential functions of the night auditor position with or without reasonable accommodations.

Under the ADA, an employer must make "[r]easonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . . ." *Jackson v. Blue Mountain Co.*, 761 F. App'x 356, 359 (5th Cir. 2019) (quoting 42 U.S.C. § 12112(b)(5)(A)). "An employee who needs an accommodation . . . has the responsibility of informing [his] employer" and "[m]ust explain that the [proposed] adjustment in working conditions . . . is for a medical condition-related reason." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016) (quoting *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)). After an accommodation has been requested, "[t]he employer must engage in an 'interactive process' with the employee with 'the goal of finding an appropriate accommodation for the limitation.'" *Jackson*, 761 F. App'x at 360 (citing *Chevron Phillips*, 570 F.3d at 621). But if "the breakdown in the interactive process is 'traceable to the employee,' there is no violation." *Id*. (citing *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011)).

In her deposition, Jones explained why she requested the night auditor position during her initial job interview with Singh. She was "recovering from a nervous breakdown," "suffered from depression, anxiety, and insomnia" and "needed to get back to normal living." Docket No. 50-1 at 9. Because Jones did not want "too much contact" with guests, she "requested the night audit[] to minimize interaction with other people." Docket No. 50-1 at 9. At bottom, Jones' testimony demonstrates that the night shift was specifically requested by Jones to manage her mental health needs.

Moments later in her deposition, though, Jones changed course. Jones stated that her gallstone pancreatitis — not her depression, anxiety, or insomnia — "[p]rohibited [her] from doing the functions of the night audit *or any work at the hotel*." *Id*. at 10 (emphasis added). When probed further as to whether any of Jones' alleged disabilities — depression, anxiety, insomnia, or the gallstone pancreatitis — prevented her from "working certain days or certain shifts as a night auditor," Jones replied, "the first three abilities, not so much. The fourth disability, yes, it affected every shift." *Id*.

Jones' failure to accommodate claim collapses because her gallstone pancreatitis prevented her from performing "the functions of the night audit or any work at the hotel." *Id.* In other words, whether Janus provided an accommodation to Jones is irrelevant because her gallstone pancreatitis prevented her from performing the essential functions of the job. It is not clear on this record what kind of accommodation could have helped her as she worked through that condition. Accordingly, with respect to her gallstone pancreatitis concerns, the Court finds that Jones has failed to establish the third element of her prima facie case.

### 2. Depression, Anxiety, and Insomnia

Seemingly falling back on her mental health concerns, Jones again fails to satisfy the requisite elements necessary to establish a failure to accommodate claim, this time because she is not a qualified individual with a disability.

Jones' deposition testimony demonstrates that neither her depression, anxiety, nor insomnia substantially limited her life activities. In fact, those illnesses barely had an effect on Jones at work.

As previously mentioned, when pressed whether her depression, anxiety, insomnia, or the gallstone pancreatitis prevented her "from working certain days or certain shifts as a night auditor," Jones emphasized "the first three disabilities, not so much. The fourth disability, yes, it affected every shift." *Id*.

Viewing this evidence in the light most favorable to Jones, the record makes clear that Jones' mental health illnesses did not affect her work availability or ability to perform her duties and responsibilities. Docket No. 50-1 at 10. At minimum, Jones' deposition testimony illustrates how she herself narrowed the realm of her alleged disabilities. That tied any reasonable accommodation her employer owed to her to her gallstone pancreatitis procedure and nothing more. Summary judgment is therefore appropriate on this claim as well.

## IV.     Conclusion

For the foregoing reasons, Janus's *Motion for Summary Judgment* is granted in part and denied in part.

**SO ORDERED**, this the 30th day of May, 2023.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE